**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BRUCE FIEGEL Derivatively on Behalf of HECLA MINING COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> PHILLIPS S. BAKER, JR., LINDSAY A. HALL, LAWRENCE P. RADFORD, THEODORE CRUMLEY, CATHERINE J. BOGGS, GEORGE R. JOHNSON, GEORGE R. NETHERCUTT, JR., STEPHEN F. RALBOVSKY, TERRY V. ROGERS, and CHARLES B. STANLEY, <br><br> Defendants, <br><br> -and- <br><br> HECLA MINING COMPANY, a Delaware corporation, <br><br> Nominal Defendant. | Case No. <br><br> **JURY TRIAL DEMANDED** |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Bruce Fiegel ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Hecla Mining Company ("Hecla" or the "Company") against the members of its board of directors (the "Board"). The wrongdoing alleged herein has caused substantial damage to Hecla's reputation, goodwill, and standing in the business community, and has also exposed Hecla to substantial, potential liability for violations of federal securities law.

2.      Hecla is a mining company that operates in Coeur d'Alene, Idaho. Hecla's is involved in mining of silver, gold, lead, and zinc. The Company makes lead, zinc, and bulk concentrates, which it forwards to custom smelters, brokers, and bullion bars, where the products are further altered before sale.

3.      On March 19, 2018, Hecla said it was buying three Nevada gold mines through its acquisition of Klondex Mines Ltd. ("Klondex") for a combination of cash and stock valued at $462 million. Hecla represented that Klondex's three mines – Fire Creek, Midas, and Hollister (the "Nevada Operations") are among the "highest-grade gold mines in the world." In Hecla's press release, it said "Fire Creek is a cornerstone producing asset with robust cash flows and significant opportunities for exploration, mine life expansion, and increased throughput." Additionally, Hecla stated "Midas is an older mine that had been in production for decades but was still purportedly providing production and cash flow… Hollister was important for the prospective development and mining of the Hatter Graben discovery, a large system of veins which could be reached from Hollister." Following the purchase of the Nevada Operations in July 2018, Hecla's Nevada Operations became its fifth operating segment joining four of its other existing sites, Greens Creek, Lucky Friday, Casa Berardi, and San Sebastian units.

4.      On March 19, 2018, the certain Individual Defendants falsely said that "[a]fter extensive due diligence" the Company determined that the Nevada Operations would be

"accretive" and cash flow positive, or at the very least "self-funding."

5.  From 2018 and into 2019, the Hecla indicated "robust cash flows" of the Nevada mines, falsely said that "[t]hese assets immediately add production and cash flow," claiming that "[t]he Nevada assets are basically self-funding" and asserting that "Nevada itself will be cash flow positive for us."

6.  On May 9, 2019, Hecla surprised its stockholders when it issued a press release entitled "Hecla Reports First Quarter 2019 Results[;] Nevada operations under review," wherein the Company said it was conducting a comprehensive review of its Nevada Operations that it characterized during the following conference call as "really just asking the question, are we going to get the return for the investment we're making?" Certain Individual Defendants acknowledged that because the Nevada Operations suffered from negative cash flow and other negative operating numbers, they were unsure if Hecla would achieve a positive return on its investment and that the Nevada Operations may in fact be a liability. In the conference call, Hecla's President and CEO stated:

> A year ago when doing the due diligence, we recognized certain problems with Fire Creek dealing with the tough material, managing the water, equipment availability, getting enough development to have consistent production, lack of characterization of ore types and while we've made progress in dealing with the issues we saw, the short answer is, it's not been enough.

7.  Following this statement, the price of Hecla's common stock plunged more than 23% over the course of two trading days, from a closing price of $2.04 per share on May 8, 2019 to $1.56 per share on May 10, 2019, wiping out $230 million of market capitalization.

8.  On June 6, 2019, Hecla stated in a further press release headed "Hecla Reduces Spending for Nevada Operations," that going forward it would only mine currently developed ore at one of its sites, while another mine site would be mined only through year end, and

another mine site would be shuttered. Also, Hecla would heavily reduce exploration at another of its sites to reduce cash consumption. As a result, Hecla would lay off 25% of its Nevada workers and its production for the Nevada Operations would be reduced by 20% to 60,000 ounces.

**JURISDICTION AND VENUE**

9.      Pursuant to 28 U.S.C. §1331 and Section 27 of the Securities and Exchange Act of 1934 ("Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 14(a) of the Exchange Act and SEC Rule and 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

10.      This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual with sufficient contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.      Venue is proper in this jurisdiction pursuant to section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) because Hecla is a Delaware corporation and this action is governed by a forum selection clause which requires that the sole and exclusive forum for a shareholder derivative action is a Delaware state or federal court.

**THE PARTIES**

**Plaintiff**

12.      Plaintiff Bruce Fiegel is, and has continuously been, a stockholder of Hecla since the time of the wrongdoing complained of herein. Plaintiff is a citizen of Illinois.

**Nominal Defendant**

13.      Nominal Defendant Hecla, is a company engaged in discovering, acquiring,

developing, and producing silver, gold, lead, and zinc. The principal executive offices of Hecla are at 6500 North Mineral Drive, Suite 200, Coeur d'Alene, Idaho. Hecla shares trade on the NYSE under the ticker symbol "HL."

**Individual Defendants**

14.     Defendant Phillips S. Baker, Jr. ("Baker") has been Hecla's CEO since May 2003, its President since November 2001, and served as a member of its Board since 2001. He was formerly Hecla's CFO from May 2001 through June 2003, COO from November 2001 to May 2003, and Vice President from May 2001 to November 2001.

15.     Defendant Lindsay A. Hall ("Hall") has served as Senior Vice President, CFO and Treasurer of the Hecla since July 2016.

16.     Defendant Lawrence P. Radford ("Radford") has been the Company's Senior Vice President – Operations since October 2011.

17.     Defendant Theodore Crumley ("Crumley") has been Chairman of the Board since May 2006 and as a director of Hecla since 1995.

18.     Defendant Catherine J. Boggs ("Boggs") has served on Hecla's Board since January 2017. Boggs is the current chairperson of the Board's Corporate Governance/Directors Nominating committee and has been a member of this committee and the Audit and Compensation Committees since 2017.

19.     Defendant George R. Johnson ("Johnson") has served on Hecla's Board in March 2016. Johnson has been a member of the Board's Audit Committee and Health, Safety, Environmental & Technical ("HSE&T") Committee (formerly the Technical Committee) since at least 2017 and the Corporate Governance/Directors Nominating Committee since at least 2018.

20.     Defendant George R. Nethercutt, Jr. ("Nethercutt") has served on Hecla's Board since February 2005. Nethercutt has been a member of the Board's Compensation Committee,

and its chairperson from 2008 until 2017, and the Corporate Governance/Directors Nominating Committee and its chairperson, since at least 2007.

21.     Defendant Stephen F. Ralbovsky ("Ralbovsky") has served on Hecla's Board since March 2016. Ralbovsky has been a member of the Board's Audit and Corporate Governance/Directors Nominating Committees since 2016, and Chairperson of the Audit Committee since at least 2017.

22.     Defendant Terry V. Rogers ("Rogers") has served on Hecla's Board since May 2007. Rogers has been on the Board's Executive Committee since at least 2016 and on the Audit Committee from 2009 until 2017.

23.     Defendant Charles B. Stanley ("Stanley") was appointed to Hecla's Board in May 2007. Stanley has been a member of the Board's Audit Committee since at least 2007 and its Chairperson from 2015 until 2018, and member of the Corporate Governance/Directors Nominating Committee since at least 2011.

24.     Defendants Baker, Crumley, Boggs, Johnson, Nethercutt, Ralbovsky, Rogers, and Stanley are collectively referred to as the "Director Defendants or the Individual Defendants".

## DUTIES OF THE INDIVIDUAL AND DIRECTOR DEFENDANTS

**Fiduciary Duties**

25.     By reason of their positions as officers and/or directors of the Company, each of the Individuals Defendants owed and continues to owe Hecla and its stockholders' fiduciary obligations of trust, loyalty, good faith, and due care, and was/is required to use his utmost ability to control and manage Hecla in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Hecla and its stockholders, to benefit all stockholders equally, and not in furtherance of their personal interest or benefit.

26.     Each of the Individual Defendants owed and continues to owe Hecla, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

27.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Hecla, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Hecla, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls, so that the market price of the Company's stock would be based on truthful and accurate information.

28.     To discharge their duties, the Director Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Director Defendants were required to, among other things:

> (a)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

> (b)     conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

> (c)     remain informed as to how Hecla conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Conduct**

29.     The Director Defendants, as officers and/or directors of Hecla, were also bound by the Company's Code of Conduct (the "Code of Conduct"), which all directors and employees are obligated to follow and "applies to all of (Hecla's) directors and employees (including officers)…"[1] In particular, the Code of Conduct mandates that "the Company's SEC filings and other public communications should contain full, fair, accurate, timely and understandable disclosures."

30.     The Director Defendants, because of their positions of control and authority as officers and/or directors of Hecla, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Director Defendants also failed to prevent the other Director Defendants from taking such illegal actions. In addition, as a result of certain defendants' improper course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of federal securities laws. As a result, Hecla has expended, and will continue to expend, significant sums of money.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT[2]

**Background**

31.     Hecla is involved in mining of silver, gold, lead, and zinc. The Company makes

---

[1] *See* Code of Conduct at: http://ir.hecla-mining.com/Cache/1001235500.PDF?O=PDF&T=&Y=&D=&FID=1001235500&iid=4130678

[2] Plaintiff's allegations with respect to the misleading statements in the 2018 and 2019 Proxy Statements are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness about these allegations and related claims.

lead, zinc, and bulk concentrates, which it forwards to custom smelters, brokers, and bullion bars, where the products are further altered before sale.

32.     In 2017, Hecla reached out to Klondex, and discussed a review of the Company, with the intention of possibly purchasing some of Klondex's assets. Among Klondex's assets were the Nevada mines (referred to as "the Nevada site(s)", "the Nevada mine(s)" or "the Nevada Operation(s)").

33.     On November 9, 2017, the Klondex board of directors approved Hecla's request to undertake due diligence following which Hecla signed a confidentiality agreement. On November 21, 2017, Hecla was given access to a database which included an overview of, among other things, the Nevada mines. Hecla employees also visited the Nevada mines beginning on January 10, 2018.

34.     On January 23, 2018, Hecla reached out to Klondex's management and indicated that a proposal would be imminent. The next day, Hecla gave a non-binding proposal to buy all of Klondex's outstanding stock for $630 million in cash and Hecla stock. Once defendant Baker conversed with Klondex's Chairman on January 28, 2019, this offer rose to $647 million.

35.     In February 2018 the price of Klondex's shares dropped from $2.27 per share on February 1st to $1.32 per share on February 28th, after Klondex's release of its earnings for 2017, and estimates for 2018, showing a full year loss of over $23 million compared to a loss of under $2 million for 2017.

36.     On February 9, 2018 *The Northern Miner* published an article headed "Klondex sees grades drop at Fire Creek gold mine" which stated:

> On Feb. 6, Klondex released an upgraded technical report showing that Fire Creek's underground proven and probable gold reserves had dropped 22%, while average grades were down 42% to 24.3 grams gold per tonne.
>
> The project now hosts 289,000 proven and probable tonnes grading 24.3 grams

gold and 23.66 grams silver for 229,000 equivalent oz. gold.

Meanwhile, Fire Creek's measured and indicated resources were hit with a 28% grade drop, and now total 622,000 tonnes at 23.33 grams gold and 23.33 grams silver for 473,000 oz. gold equivalent.

\*       \*       \*

BMO Capital Markets analyst Brian Quast cut his price target on Klondex by 25¢ to $2.50 per share. He noted that tonnage had increased at Fire Creek, but that "grades and ounces suffer."

"It is our contention that very little, if any, of the open-pit resources at Fire Creek will be high enough grade to truck to the Midas mill," Quast wrote.

37.     On this news, Hecla and Klondex began re-negotiating their deal and ultimately reached a new deal on March 16, 2018.

38.     On March 19, 2018, the Company announced that it was buying the three high-grade Nevada gold mines through the acquisition of Klondex for a mix of cash and stock worth $462 million. Defendant Baker represented that the Nevada Mines are some of the "highest-grade gold mines in the world" and that "[a]fter extensive due diligence, we see significant opportunity to improve costs, and recoveries over time with our expertise."

39.     After the purchase closed in July 2018, the Nevada Operations became Hecla's fifth operating unit.

40.     On March 19, 2018 the Company issued a press release headed: "Hecla to Acquire Three High-Grade Nevada Gold Mines with the Acquisition of Klondex Mines Ltd.," which said:

Hecla Mining Company (NYSE:HL) (Hecla) and Klondex Mines Ltd. (NYSE American:KLDX) (TSX:KDX) (Klondex) today announced Hecla will acquire all the outstanding shares of Klondex, a high-grade Nevada underground gold producer with its Fire Creek, Midas and Hollister mines, through a plan of arrangement (the Transaction). Klondex's Canadian assets will be spun out to its existing shareholders.

Under the Transaction, Hecla will acquire Klondex for consideration of US$462 million with a mix of cash and shares of Hecla common stock and the newly formed company (Klondex Canada). Klondex's shareholders will

receive US$2.47 per share in cash or shares of Hecla, which represents a 59% premium to Klondex's 30-day volume-weighted average price, as at March 16, 2018 on the NYSE American.

> *After extensive due diligence, we see significant opportunity to improve costs, throughput and recoveries over time with our expertise. . . . We expect this transaction to be accretive on many important financial and credit metrics, with potentially significant synergies.*

(Emphasis added).

In a section headed "Benefits to Hecla Shareholders," it also stated: "Fire Creek is a cornerstone producing asset with robust cash flows and significant opportunities for exploration, mine life expansion, and increased throughput."

41.     Later, on March 19, 2018, during a conference call, Baker stated, among other things:

> The first thing I want you to know is *these assets are not new to us*. About a decade ago, we actually owned a box within Hollister. . . . *It's a great low capital and potentially high return strategy similar to what we are doing in Mexico*. So periodically, we reached out to Paul, and then *about four months ago, we began our due diligence. As part of this work, we were granted access to the properties and key people, which gave us significant insights into the properties, particularly Fire Creek*.
>
> \*       \*       \*
>
> [T]he principal driver for this deal is Fire Creek and the hundred thousand plus ounces of gold it produces a year. *It has a great cost profile* and it's the highest- grade gold mine of significant scale in North America.
>
> *Paul and his team has done a really good job of understanding the geology. . .*
>
> \*       \*       \*
>
> While Fire Creek is the driver of the transaction, we're also excited about the prospects for Hollister and Midas. At Hollister, it's primarily about the prospective Hatter Graben project with over 1,400 vertical feet of veins and over 2,000 feet of strike While Midas has a short mine life, there is a big resource position that gives us optionality to higher prices and we're going to

- 11 -

probably continue the exploration that Klondex has started on the Trinity.

(Emphasis added).

42.     Again, on March 19, 2018, in response to someone that queried what the ongoing maintenance capital expenditures for the Nevada mines would be, defendant Baker said the operations would be cash flow positive:

> [B]ut all of this stuff is relatively small capital. That was one of the things that struck us is we can acquire this. ***Nevada itself will be cash flow positive for us. There is no capital outlay that we're looking to, in Nevada, that's going to consume all of the cash flow that will be generated from the three mines***.

(Emphasis added).

43.     On April 9, 2018, Hecla issued its Proxy Statement on Form 14(a) with regard to its Annual Meeting of Shareholders scheduled for May 23, 2019 ("2019 Proxy"). It was signed by all of the Director Defendants.

44.     Among other things, the 2018 Proxy contained a section on Governance and Ethics which states:

> The Board, directly and through the Corporate Governance and Director's Nominating Committee ("Governance Committee"),seeks to maintain corporate governance practices that are aligned with our strategic, financial and operational goals. We do this by conducting processes at least annually to evaluate, optimize and update governance and practice guidelines..

45.     The 2018 Proxy Statement also contains a section on Corporate Governance and Related matters.  The 2018- Proxy Statement stated that the Company's directors and employees, including its principal executive officer, principal financial officer, principal accounting officer, and controller, or persons performing similar functions, are subject to the Company's Code of Conduct. which states in part:

> We believe that good corporate governance practices reflect our values and support our strong strategic and financial objectives and performance. Our

corporate governance practices are generally reflected in our Bylaws, Corporate Governance Guidelines, Code of Conduct, and committee charters, which can all be found at http://www.hecla-mining.com.

46.     The 2018 Proxy also has a section entitled "Code of Conduct" which states in part the following:

We believe that operating with honesty and integrity has earned trust from our shareholders, credibility within our communities and dedication from our employees. Our directors, officers and employees are required to abide by our Code of Conduct to promote the conduct of our business in a consistently legal and ethical manner. Our Code of Conduct covers many topics, including conflicts of interest, confidentiality, fair dealing, proper use of the Company's assets, and compliance with laws, rules and regulations. In addition to the Code of Conduct for directors, officers and employees, our CEO, Chief Financial Officer and Controller are also bound by a Code of Ethics for the Chief Executive Officer and Senior Financial Officers.

47.     The above statements contained in the 2018 Proxy Statement regarding the Code of Conduct and Corporate Governance are materially false and misleading because by issuing or permitting to be issued the other materially false and misleading statements as set forth above the Director Defendants violated Section 14(a) of the Exchange Act because they failed to disclose that the directors did not comply with the Code of Conduct in that they did not comply with the laws, rule and regulations regarding the requirement that all statements made by the Company or a spokesperson not be materially misleading or to omit material facts needed to make such statements not misleading.

48.     On May 10, 2018, during the conference call to discuss first quarter profits, defendant Baker stated:

We saw three large, in this case Nevada, properties as big as those that we already have and we saw extraordinary grades similar to what we see at Greens Creek. We saw the likelihood of converting the Fire Creek resources that are identified at a higher grade as we develop it. And we saw numerous operational improvement possibilities and we sell properties where the exploration team at Klondex seems to crack the core geologically for making further discoveries.

But there is still a lot to learn and we expect the deal to close around the end of June [-] ***everything is on track***.

(Emphasis added).

49.    On July 23, 2018, Hecla issued a press release announcing that the Company had

completed purchasing Klondex:

"With this acquisition, Hecla now has three high-grade mines in Nevada, one of the best mining districts in the world," said Phillips S. Baker, Jr., President and CEO. "***These assets immediately add production and cash flow***, and because they are a good fit with Hecla's expertise, we believe there is significant opportunity for improvement in the mines' productivity and consistency.

(Emphasis added).

50.    On August 9, 2018, the Company published financial results for the second

quarter of 2018 which stated:

"We have now closed the acquisition of the high-grade Nevada mines, and are beginning their integration into Hecla," Mr. Baker added. "Our plan is to operate the mines and mill as one unit, allocating the workforce and capital to generate margins and ***focus on profitability, not just on production for production's sake. Fire Creek has the best margin of the 3 mines by a considerable amount***, so ramping it up is our priority"

(Emphasis added).

\*       \*       \*

As is our mantra at Hecla, all operations need to generate positive cash flows in their mine plans and we expect Nevada will be no different. ***The Nevada assets are basically self-funding.*** The cash flow from production pays for the $11 million in development and definition drilling expenditures in the last half of the year, and as well, $5 million related to the completion of the new tailings facility plus the CIL planned improvements . . . .

(Emphasis added).

51.    Baker continued to re-iterate that the Nevada mines would be profit generating

from the beginning:

**[John David Bridges, *Senior Analyst*:]** Good morning, Phil, everybody. I

just want to dig into cash flows. Your intention is to have the Nevada assets being cash flow neutral to you as soon as possible. When is that likely to be? And then, when will they be contributing to the portion of debt that they've – that you are sort of – you have taken on in the form of the revolver to run those, just to start with?

[**Baker:**] Well, I guess two things. ***One is the expectation is this year that for the five months, it will be self-funding. We're not anticipating needing to contribute additional capital into it.*** And two, we haven't drawn on the revolver. Our net cash position is positive.

(Emphasis added).

52.     On November 8, 2018, the Company published financial results for the third quarter of 2018 ("the third quarter of 2018 results"):

> "***Our strategy is working. The EBITDA we generated*** despite low metals prices ***is a result of the improvements we made in our mines.*** A case in point is Casa Berardi, which is generating strong cash flow, with lower costs, higher mine throughput and an extended mine life," said Phillips S. Baker, Jr., President and CEO. "***The Nevada operations are on the same path as Casa Berardi and Greens Creek, with the development and processes which should increase throughput and make the mines more efficient. In the meantime, the higher costs in Nevada are short-term and a function of electing to produce less to avoid sterilizing newly discovered mineralization.***"

> \*          \*          \*

> "In the 100 days we have owned the Nevada properties we have been in continuous change - winding down Midas, ***resolving the roadbed issues at Fire Creek***, advancing the development at Hatter Graben, and completing the capital projects on the mill and tailings facility. We expect the pace of change to continue as we commission a new batch plant that should improve ground control, test a road- header to improve mining in soft rock and rework the mine plan as we gain more knowledge. ***However, we don't believe we will need to make significant new financial investment to put the mine on the same improvement path that we have seen at Greens Creek and Casa Berardi***," said Mr. Phillips S. Baker, Jr.

(Emphasis added).

53.     Another conference call was held on November 8, 2018 regarding the third quarter of 2018 results wherein Radford stated (including in response to questions):

*[O]ur goal for Nevada operations is that the operations are cash-neutral*, including Hatter Graben development and the Fire Creek development ramp-up.

(Emphasis added).

\*   \*   \*

[W]e're not anticipating the need to make significant contributions into Nevada, right? We see Nevada being able to largely pay for the Hatter Graben, to pay for the development within Fire Creek. *We think we can run it pretty close to cash flow neutral. And that is what we have suggested we would be able to do.*

\*   \*   \*

No, I'll just say this. It's exactly where we thought we'd be. *We acquired Nevada for the cash flowing potential at the Fire Creek. That will start happening*.

(Emphasis added).

54.     On December 4, 2018, Hecla held a conference call during which defendant Hall said:

*There's no major capital expenditures that we can't fund out of the Nevada operations*. So we're really quite pleased with the transaction.

(Emphasis added).

55.     On February 21, 2019, Hecla reported results for the fourth quarter and year ended December 31, 2018 stating:

"Greens Creek and Casa Berardi are the economic engines of Hecla, and the continued increase in reserves and resources, extended mine life and positive changes to the mine plans are surfacing additional value at these operations," said Phillips S. Baker, Jr., President and CEO. "This allows investment in our three other mines, which all have the potential to be long-lived with strong economics like Greens Creek and Casa Berardi. *The turnaround of the Nevada operations continues with an increasing development rate at Fire Creek that should allow the mine to have operating consistency as we increase production.* This is the same approach we took when we first acquired Greens Creek and Casa Berardi. Substantial exploration is planned for both Fire Creek and Hollister this year as we work to convert resources to

reserves and discover additional resources. With the Hatter Graben decline about 15% complete, we expect to start drilling between the current Hollister mine area and the Hatter Graben soon."

(Emphasis added).

56. In a conference call following the release of the fourth quarter of 2018 results, defendant Baker stated:

> *[W]e've made significant progress*. Much of it will not be visible to you and many statistics yet, but *Larry is going to talk to you about the progress we've made in development. It's been significant*, but we're still trying different ways of dealing with different conditions in the mine. So while we're in a hurry to get to a steady state, we will take the time necessary to figure out the challenges of these mines, so our Nevada operations will deliver value for the long-term.
>
> \*       \*       \*
>
> We're happy with our cost at our operating units other than Nevada operations which we reported higher cost, *while we work through what we believe are transitional issues*.
>
> \*       \*       \*
>
> *We expect in 2019, the Nevada mining operations will be cash flow positive*, but we'll invest those cash flows in more in exploration around the various Nevada mine sites and the development of the Hatter Graben and decline.

(Emphasis added).

> Defendant Radford also said:
> Let's move on to Nevada on Slide 15, where most of our focus is this year. We have a plan to turnaround the access and we are working on that plan. *In 2018, the focus was on getting the operations back on track in terms of understanding ground conditions at Fire Creek and getting the team organized.*
>
> *We have come a long way in this regard*. Our strategy is simple, develop and drill. We believe that the grades can be improved through new discoveries and resource conversion and ore production can be ramped up by opening up more working zone. Fire Creek, we have done review of equipment and we're adding equipment from Midas and from buying some new equipment.
>
> We've added two trucks, two large loaders, one jumbo, two bolters to the Nevada fleet for cost of total of about $6 million with the expectation that the

upgrade will increase productivity. The implementation of shaft fleet into the development process is resulting in better ground conditions as expected, which should minimize and need to go back and rehab development immediately as was the case on the priority management.

The CIL plant upgrade is complete and the mill is now able to process Hollister ore [indiscernible]. We have exceeded our annual development target of 35 feet per day in January as shown on Slide 16 and the goal will be to maintain this level and increase it were possible because this should open up additional headings and increase production.

We have wrapped up Fire Creek manpower for underground manpower from 76 to about 110 through transfer of Midas in the Hollister miners. Our contractor has brought in a roadheader at Fire Creek and it's easily cutting the soft tough material, which is helping to speed up development and we are considering a wider application of this type of chain.

***We're planning to increase Fire Creek throughput midyear to about 520 tons per day from 340 tons per day which was the fourth quarter average, which means that the gold production will be weighted towards the second half of the year. The increased development is an important step for Dean's group as we have worked to do definition drilling to upgrade resources and exploration to discover additional resources.***

(Emphasis added).

57.     During questions regarding fourth quarter of 2018 results, an analyst asked defendant Baker:

If I may, my questions are mostly on Fire Creek here. I understand that Fire Creek and the entire sort of Nevada complex is still a work in progress, but certainly in 2018 a transitional year, there were some disappointments with the decrease of reserves beyond what was produced. I'm just trying to get a better understanding in terms of what has been the biggest surprise to you at these Nevada assets in terms of reserves, in terms of production, as ownership has handed -- since ownership has been handed over to Hecla?

58.     In response, defendant Baker avoided talking about the undisclosed issues with Fire Creek or any other Nevada mine, but rather shifted the focus to Klondex being the reason for any delays "But I think the biggest surprise and disappointment was the Klondex didn't follow the budget that they had presented to us."

59.     Defendants Baker and Radford talked about progress with respect to water in the

Fire Creek mine:

**[Heiko Ihle**, *Senior Metals & Mining Analyst***:]** And speaking of Nevada and following up from the question that Cosmos have asked. I mean you mentioned, the increasing the throughput at Fire Creek from 350 tons per day to 520 tons per day by 2019. You've also been stated your focus on, and this is from your lease, maintaining the development grade and all ground conditions. Am I reading something into here that's not there? Is there something I missing? I thought the ground conditions are into that mine as the ground conditions at Fire Creek are actually pretty solid. Is there -- are there pockets that need extra ground support? Or again am I missing something there?

**[Baker:]** Yes, when you remember when we first brought it, we talked about fact that we had this tuft that created road conditions that we have to come in with the synthetic liner and build a road base. Well, that's -- so, we dealt with the road conditions, but you have that same condition on the back and on the ribs. And so that's what Larry is alluding to with shot creating that we've have to do and that's why we're contemplating the road leader going through this soft material. Larry?

**[Radford:]** Yeah, it's variable, you can see very good ground conditions for albeit 24 feet a day and a given heading. And then times we run into altered tuffs and very clay like material that take short rounds and requires a fair amount of support. And the additional shot treatment. So it's variable.

**[Baker:]** And then you also have the introduction of water into this tuff, which again -- if you think about if you look at those pictures of the road, you get a sense of how soupy it becomes and difficult to operate in. And so, we're trying to figure out the best way to deal with the changing ground conditions. And so, that's why I continue to make a point that we're experimenting, we're trying new things. I'm more interested in Larry coming to a series of standards depending on the ground conditions rather than just being so worried about getting the development. But, Larry.

**[Radford:]** You've mentioned water, there's perks water in certain pockets and we're looking at a bit more of a mobile dewatering plan so that we're not managing the water underground. So, yes, we've shown, as Phil alluded, we've shown photos of some of the poor conditions and what we're doing to manage them. We've got the right team there. I mentioned the roadheader, it's actually a very small roadheader that we're trialing right now. And if it continues to perform as well as it seems to be, we may go all in for a large roadheader, I'm a really large roadheader and really jack up the advanced grade.

60.     On February 22, 2019, the Company lodged its Annual Report with the SEC on

Form 10-K for 2018. The 2018 Form 10-K mentioned problems at Fire Creek due to previous lagging development issues and the Company's intentions mining in 2019:

> ***There has been a lack of investment in mine development, including horizontal drifts ("Haulages") and the ramp or decline system ("Spirals"), at Fire Creek. As a result, there have not been sufficient platforms to keep quality targets in the pipeline to replenish reserves as they are depleted. In late 2018, definition drilling focused on the upper portions of Spiral 3 along the Honeyrunner, Karen and Hui Wu structures and the up-dip southern extents of Joyce, 06 and 08 veins to advance the Spiral 4 area.*** Underground drift development is advancing Haulage 9 to provide an exploration drill platform by early next year. This platform will enable exploration drilling to further drill and extend Spiral 9 veins to the south and the Karen structure back to the north.

> ***In 2019, the emphasis of definition drilling is expected to be on bringing Spiral 4 and Spiral 9 mineralized material into indicated resource inventories.*** Definition drilling at Spiral 3 is proposed south of Spiral 2, to follow up on previous significant drilling intercepts south of Spiral 9 and north of the 5350 North Haulage. Drilling will also continue to focus on upgrading resources along strike on the Titan Zone. An area of future potential drifting is to the north of the North Haulage at the 5350- elevation following up on surface success on veins to the northeast of the current Fire Creek mine.

> (Emphasis added).

61.     The 2018 Form 10-K, which was signed by Baker, Hall, Crumley, Boggs, Johnson, Nethercutt, Ralbovsky, Rogers and Stanley, for the first time raised some degree of doubt as to whether the anticipated benefits from purchase of Klondex and the Nevada Operations owned by Klondex might not happen:

> ***We may not realize all of the anticipated benefits from our acquisitions, including our recent acquisition of Klondex.***

> We may not realize all (or any) of the anticipated benefits from any acquisition, such as increased earnings, cost savings and revenue enhancements, for various reasons, including difficulties integrating operations and personnel, higher than expected acquisition and operating costs or other difficulties, unknown liabilities

> which may be significant, inaccurate reserve estimates, unrealized

exploration potential, mill recoveries that are lower than required for portions of the orebodies to be economic, and fluctuations in market prices.

***The properties we may acquire may not produce as expected, and we may be unable to determine reserve potential, identify liabilities associated with the acquired properties or obtain protection from sellers against such liabilities.***

The properties we acquire in any acquisition, including our recently-acquired Nevada Operations unit, may not produce as expected, may be in an unexpected condition and we may be subject to increased costs and liabilities, including environmental liabilities. Although we review properties prior to acquisition in a manner consistent with industry practices, such reviews are not capable of identifying all existing or potential adverse conditions. Generally, it is not feasible to review in depth every individual property involved in each acquisition. Even a detailed review of records and properties may not necessarily reveal existing or potential problems or permit a buyer to become sufficiently familiar with the properties to fully assess their condition, any deficiencies, and development potential.

(Emphasis in original).

62.    On April 9, 2019, Hecla issued its Proxy Statement on Form 14(a) with regard to its Annual Meeting of Shareholders scheduled for May 23, 2019 ("2019 Proxy"). It was signed by all of the Director Defendants.

63.    Among other things, the 2019 Proxy contained a section on Governance and Ethics which states:

The Board, directly and through the Corporate Governance and Director's Nominating Committee ("Governance Committee"), seeks to maintain corporate governance practices that are aligned with our strategic, financial and operational goals. We do this by conducting processes at least annually to evaluate, optimize and update governance and practice guidelines. Our Code of Conduct demonstrates our commitment to seeking and delivering best practices in ethics and integrity in every aspect of our business. While your Board and employees are obligated to follow this code, we expect Company leaders to set the example – to be models in every respect. And we expect all those with supervisory responsibility to exercise that responsibility in a manner that is caring, receptive, considerate, and respectful. Our Corporate Governance Guidelines also provide shareholders with the best-practice principles of our corporate governance program and board framework.

64.    It also contains a section on Corporate Governance and Related matters.  The

2019 Proxy Statement stated that the Company's directors and employees, including its principal executive officer, principal financial officer, principal accounting officer, and controller, or persons performing similar functions, are subject to the Company's Code of Conduct., which states in part:

> We believe that good corporate governance practices reflect our values and support our strong strategic and financial objectives and performance. Our corporate governance practices are generally reflected in our Bylaws, Corporate Governance Guidelines, Code of Conduct, and committee charters, which can all be found at http://www.hecla-mining.com.

65.     The 2019 Proxy also has a section entitled "Code of Conduct" which states in part the following:

> We believe that operating with honesty and integrity has earned trust from our shareholders, credibility within our communities and dedication from our employees. Our directors, officers and employees are required to abide by our Code of Conduct to promote the conduct of our business in a consistently legal and ethical manner. Our Code of Conduct covers many topics, including conflicts of interest, confidentiality, fair dealing, proper use of the Company's assets, and compliance with laws, rules and regulations. In addition to the Code of Conduct for directors, officers and employees, our CEO, Chief Financial Officer and Controller are also bound by a Code of Ethics for the Chief Executive Officer and Senior Financial Officers.

66.     The above statements contained in the 2019 Proxy Statement are materially false and misleading because by issuing or permitting to be issued the other materially false and misleading statements as set forth above the Director Defendants violated Section 14(a) of the Exchange Act because they failed to disclose that the directors did not comply with the Code of Conduct.

67.     On April 18, 2019, Hecla issued a press release headed "Hecla Reports 2.9 Million Ounces of Silver and 60,021 Ounces of Gold Production in First Quarter 2019." It stated:

> At the Nevada operations, 10,364 ounces of gold and 67,438 ounces of silver were produced. ***During the quarter, the focus continued on establishing a robust development program in a variety of ground conditions at Fire***

***Creek*** and Hollister, rather than on production which is expected to be second half-weighted this year. ***A minor amendment to the water discharge permit for Fire Creek is expected in the second quarter which should enable a higher discharge rate.*** In addition, changes to the carbon circuit of the Midas mill are expected to improve recoveries. Ore was processed at an average of 460 tpd (combined Midas and Aurora mills).

(Emphasis added).

## THE TRUTH EMERGES

68.    On May 9, 2019, Hecla shocked investors when, before the market opened, the Company issued a press release headed "Hecla Reports First Quarter 2019 Results[;] Nevada operations under review," in which the Company detailed a comprehensive review of its Nevada Operations and putting on hold annual production and cost estimates for its Nevada Operations ("the first quarter of 2019 results"). Specifically, the first quarter of 2019 results finally admitted the Nevada site was and would likely continue to not make profit:

> ***While Nevada operations had better development advance rates, the operating metrics including cost, grade and negative cash flow, were unacceptable***. We are reviewing our Nevada operations to determine the best path forward and expect the results of this review in the second quarter. In the meantime, we are suspending our annual Nevada estimates for production and cost.
>
> *          *          *
>
> The annual production and cost outlook have been suspended for Nevada pending the results of the comprehensive review.

(Emphasis added).

69.    During a conference call following the first quarter of 2019 results, investors learned that there would likely be huge write-down of the Nevada sites due to lack of surety if the Nevada Operations would ever make a profit. Defendant Baker made the following grim statement:

> ***A year ago when doing the due diligence, we recognized certain problems with Fire Creek dealing with the tough material, managing the water, equipment availability, getting enough development to have consistent***

***production, lack of characterization of ore types***. And while we've made progress in dealing with the issues we saw the short answer is it's not been enough. The advance rate has increased, but the mill tonnage decreased by a similar percentage in the last quarter. And while we've done things to manage the water, the amount of water has increased, making the conditions worse.

***

This process is really maintaining our discipline and capital allocation, we're really just asking the question, are we going to get the return for the investment we're making. Since we don't know the outcome of the review, we are suspending guidance until we do.

(Emphasis added).

70.     People started questioning the problems with the Nevada Operation which Hecla had previously said nothing about:

> **[John David Bridges, *Senior Analyst*:]** Just wondered if you could give us a bit of color on what the problems actually are in Nevada? We heard about the water. You're waiting on some permits, is that part of it? And you say you've demobilized the contract. ***Does that mean that you stopped advancing the exploration terminals which were related to the upbeat comments that you've been giving as on exploration success? I'm just a bit confused here.***
>
> [Baker:] Sure. With respect to the water, what it has done is it's limited places that we're able to go in the mine because we cannot deal with the water fast enough to be able to effectively move forward.

(Emphasis added).

71.     On this news, the price of Hecla's common stock dropped by $0.27 per share, or 13.24%, to close at $1.77 per share, causing a loss of more than $130 million in market capitalization.

72.     On May 10, 2019, Hecla issued its quarterly report on Form 10-Q for the period ending March 31, 2019, which said:

> We are currently undertaking a review of spending at the Nevada operations which may result in the following changes at the Fire Creek mine: a reduction in capital spending; ceasing current production and only developing to spirals 9, 10 and 11; or a temporary cessation of all mine operations at Fire Creek. As

a result, the values of certain components of properties, plants, equipment and mineral interests could be adjusted in the second quarter of 2019 when we expect to finalize the allocation of the Klondex purchase price. The outcome of the review may constitute a triggering event requiring assessment of the carrying value of our long-lived assets at Fire Creek with the potential to impact near-term estimated cash flows. The mineral interests at Fire Creek have a preliminary carrying value of approximately $220 million, of which approximately $46 million is depletable. We may recognize an impairment, which could be material, if the carrying value of the assets exceeds the estimated future undiscounted cash flows expected to result from their use and eventual disposition.

73.     On this news, Hecla's common stock dropped $0.21 per share, or 11.86%, to close at $1.56 per share, resulting in a loss of $100 million in market capitalization.

74.     On June 6, 2019, Hecla issued a press release headed "Hecla Reduces Spending for Nevada Operations," in which Baker said (including in conference calls following this release) "the Nevada operations have not generated the cash flow we had hoped for so we are curtailing most development and reducing the workforce with the goal of the operation generating positive cash flow in the second half of the year."

*      *      *

A review has been conducted of the Nevada operations and changes are being made with the goal of turning it into a positive cash flowing unit.

***The new approach is to mine the currently developed ore at Fire Creek. Mining at Midas is expected to continue through the end of the year, but Hollister will be shut down***. As a result, 25% of the Nevada workforce is being laid off.* Some surface exploration drilling and hydrology studies are still planned to gather information on the deposits to help make future development programs more successful.

Third-party ore processing arrangements are also being pursued to try and reduce the transportation and milling costs. This could include mills that can process ore that is considered refractory. With water discharge from Fire Creek more than double of a year ago, work is underway to increase discharge permits and change how the water is treated.

***The Company is still committed to the exploration and definition of Hatter Graben, which is one of the key reasons the Nevada operations were acquired.***

*However, the level of development activity is being curtailed to reduce the cash consumption*, and the focus instead is expected to be on surface drilling with the goal of gaining more information on potential expansions of the deposit and to help plan the most efficient route to get to the deposit, once development is restarted.

The Company is providing revised annual 2019 Nevada production estimates of 60,000 ounces at a cost of sales of $105 million, a cash cost, after by-product credits of $1,200 per gold ounce and an all-in sustaining cost, after by-product credits, of $1,700 per gold ounce.

(Emphasis added).

\*     \*     \*

Before I go to our go-forward plan in Nevada that we announced today, I want to talk about the approach we have taken so far. You might recall we said our strategy was to develop and drill at Fire Creek. But that development drilling did not lead to the ounces and cash flow we expected. This has led us to reevaluate our plan in Nevada because we expect our assets to operate on a cash-positive basis, and clearly, this one has not.

We are choosing to take a slower, more considered approach to Nevada. We studied the ore bodies through exploration drilling, so that the cash consumption is expected to be significantly lower and our future activities had a higher chance of success. Consistent with this strategy today, we announced that we are focusing on mining at Fire Creek and pausing most of our development activities in Nevada given the cash outflow the mines had since acquisition.

With the limited development we planned at Fire Creek, we expect to mine all of the development ore available for near-term production primarily off of Spiral 2 by early 2020. Production is stopping from Hollister and is planned to continue at Midas only until year-end as we consolidate the workforce into Fire Creek.

\*     \*     \*

We plan to continue to advance the work on permitting and hydrology. At Fire Creek, the water discharge in the first 5 months of this year is over 2x what it was over the same period last year. We currently have consumptive water rights for about 160 gallons per minute out of the mine and are working on strategies to allow higher flows up to about 400 gallons per minute based on our recent work in Spiral 4.

\*     \*     \*

Our experience tells us that we are in one of the best places to find and

operate a high-grade, long-term mine. When we get to the end of mining primarily off of Spiral 2 in 2020 as we expect, we will see where we go from there. If the things we are working on come together, then we would then mine off Spirals 4 and 3. We also look at how we can do enough development to drill the highest-priority targets like Hatter Graben.

So what went wrong? As we previously described, we expected the [filling] of the indicated resources to result in higher grades as was historically the case on the project and that an increase in development will allow an increase in throughput lowering the cutoff grades. This hasn't proven to be the case in the new areas of the mine. And we're seeing more refractory ore and poor ground conditions than encountered.

While we recognized some of these issues as is typical with any acquisitions, we could -- we believed we could bring improvements and still do. But these issues were more challenging and take more time and study than we thought. While we will assess whether we have a triggering [event] to determine impairment at the end of the second quarter, I don't currently anticipate that the potential impairment would be large. Why do I say this? Because the acquisition decision ultimately was made mainly on the exploration potential that we saw in each of the properties, not the existing reserves. That has not changed. What has changed is mining at Fire Creek, which had very little reserves. We have not finished evaluating how we can approach Fire Creek with the improvements that we think can be done.

\* \* \*

**[Baker:]** I'm going to let Larry answer it, but before I do, let me just say that from my perspective, the dewatering is just one of the issues. It's not the only one, and it really relates mostly to Spiral 4. And it's -- when we look forward, we say our plan's not going to be what we thought it could be. And, Trevor, the thing that's been the surprise is the rate of increase that we've had. I mean it has literally doubled. I was in a meeting yesterday, and the guys gave the discharge numbers. And it's -- over the first 5 months, it's literally doubled. I think it's gone from 29 gallons per minute to 63 or something in that order of magnitude -- 23 to 69, that order of magnitude. So it is then something that we were not anticipating, but it's not been the only issue. Larry, why don't you add to my comments?

**[Radford:]** Well, certainly, in the -- as Phil has mentioned in the south side of the mine, there's considerable amount of water encountered in Spiral 4 and Titan areas, and it precluded us from moving forward in those areas. As I said before, there's here are a couple of things that affected 2019. One is, although development in the aggregate is on track the -- or was on track, the development in certain areas was hampered by conditions, principally water. And so that was a factor. And then as I said before, some of the definition drilling that we did, it wasn't huge but certainly impacted. That was -- it

turned out negatively for us and took some of the ounces that we had planned for 2019 off-line.

## DAMAGES TO HECLA

75.     The issuance of materially false and misleading statements as set forth above regarding the expected benefits of the acquisition of Klondex and the Nevada Operations exposed the company to myriad reputational and financial damages including liability from securities fraud litigation and legal costs associated with litigation and investigations.

## DERIVATIVE ALLEGATIONS

76.     Plaintiff brings this action derivatively and for the benefit of Hecla to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Hecla, waste of corporate assets, unjust enrichment, and as to the Director Defendants, violations of Sections 14(a) and 20(a) of the Exchange Act.

77.     Hecla is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

78.     Plaintiff is, and has been continuously at all relevant times, a stockholder of Hecla. Plaintiff will adequately and fairly represent the interests of Hecla and its shareholders in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

79.     Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

80.     A pre-suit demand on the Board of Hecla would have been futile and, therefore, is excused.  At the time of filing of this action, the Board consists of Director Defendants Baker,

Crumley, Boggs, Johnson, Nethercutt, Ralbovsky, Rogers, and Stanley. Plaintiff need only allege demand futility as to a majority of Directors who were on the Board at the time this action was commenced.

81. Demand is excused, however, as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their role in causing or permitting the Company to make materially false and misleading statements and omission of material fact which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and their co-directors. Indeed the 2018 and 2019 Proxy Statement and 2018 Form 10-K was issued in the name of each of the Director Defendants. The Director Defendants acted in bad faith in causing the statements alleged herein to be made or in permitting them to be made.

82. In complete abdication of their fiduciary duties, the Director Defendants in bad faith participated in making and/or causing and/or permitting the Company to make the materially false and misleading statements alleged herein.

**Additional Considerations**

**Non-Compliance with the Code of Conduct**

83. In violation of the Code of Conduct, the Director Directors conducted little, if any, oversight of the Company's operations to ensure that when Company spokespersons addressed the prospects of the Nevada Operations, that such statements reflected the facts known to them and that such statements did not ignore significant adverse issues faced by those operations which was concealed from the investing public until on or around May 9, 2019 when the Company disclosed that the Nevada Operations would be a drag on revenue, income and cash flow. The failure to comply with the Code of Conduct was a breach of fiduciary duty and

because the Code of Conduct was contained in the 2018 and 2019 Proxy Statements, failure to disclose non-compliance with the Code of Conduct is also a violation of Section 14(a) of the Exchange Act. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

84.     Hecla has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Directors have not filed any lawsuits against themselves or the other Individual Defendants who were responsible for that wrongful conduct to attempt to recover for Hecla any part of the damages Hecla suffered and will continue to suffer. Thus, any demand upon the Directors would be futile. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Directors can claim exculpation from their violations of duty pursuant to the Company's charter.  As a majority of the Directors face a substantial likelihood of liability, they are self- interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the stockholders of the Company. Accordingly, demand is excused as futile.

85.     The acts complained of herein constitute violations of fiduciary duties owed by the Director Defendants to Hecla, and these acts are incapable of ratification.

**Insurance Considerations**

86.     The Director Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Hecla. If there is a directors and officers'

liability insurance policy covering the misconduct alleged herein, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Hecla, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

87.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Hecla to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

88.    Thus, for all of the reasons set forth above, all of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Director Defendants
*for Violations of Section 14(a) of the Exchange Act*

89.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

90.    The Section 14(a) Exchange Act claims alleged herein are based on the issuance of materially misleading Proxy Statements in 2018 and 2019 solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to

any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

91.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

92.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

93.     Under the direction and watch of the Director Defendants, the 2018 and 2019 Proxy Statements failed to disclose material adverse facts about the Director Defendants and certain officers' non-compliance with the Code of Conduct and Corporate Governance regulations. Specifically, if Defendants had complied with such guidelines they would have disclosed in public statements made that:

a)      the Nevada Operations would not be cash neutral but would in fact drain significant cash that would have to be directed to resolve a multitude of material problems first identified by the Company during its extensive due diligence of the Nevada Operations prior to the announced acquisition but which were hidden until many months later;

b)      it was unlikely that the Fire Creek mine would become cash flow neutral any time in the near term due to a decline in gold reserves and grades which was first identified in a February 2018 technical report well before there was any public disclosure of such issues;

c)      that the Nevada Operations were hemorrhaging cash due to the Company's attempts to resolve a multitude of material problems first identified by the Company during its extensive due diligence of the Nevada mines prior to the announced acquisition but not disclosed to the investing public until many months later;

d)      it was unlikely that the Fire Creek mine would become cash flow neutral any time in the near term due to a multitude of known but undisclosed and unresolved problems; and

e)      while choosing to speak about issues with the mine due to a lack of earlier development, and the mining of Spiral 4, the Individual Defendants failed to disclose the multitude of ongoing, undisclosed and unresolved problems (including the severe water issues with Spiral 4) which would make such development extremely unlikely or impossible in the near term.

94.      The 2018 and 2019 Proxy Statements were also false and misleading because, despite assertions to the contrary, Hecla's Code of Conduct was not followed, as the Director Defendants made and/or caused the Company to make the materially false and misleading statements discussed herein.

95.      In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements

contained in the 2018-2019 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2018 and 2019 Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

96.     The materially false and misleading elements of the 2018-2019 Proxy Statements led to the re-elections of all of the Director Defendants which allowed them to continue breaching their fiduciary duties to Hecla.

97.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018-2019 Proxy Statements.

98.     Plaintiff on behalf of Hecla has no adequate remedy at law.

### SECOND CLAIM
**Against the Director Defendants**
*for Violations of Section 20(a) of the Exchange Act*

99.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

100.     The Director Defendants, by virtue of their positions with Hecla and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Hecla and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Director Defendants had the power and influence, and exercised same, to cause Hecla to engage in the illegal conduct and practices complained of herein.

101.     Plaintiff on behalf of Hecla has no adequate remedy at law.

### THIRD CLAIM
**Against Director Defendants**
for Breach of Fiduciary Duties

102.     Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

103.     Each Director Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Hecla's business and affairs.

104.     Each of the Director Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

105.     The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Director Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Hecla.

106.     In breach of their fiduciary duties, the Director Defendants caused the Company to engage in the misconduct described herein.

107.     In further breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

108.     Also in breach of their fiduciary duties, the Director Defendants in bad faith made and/or caused the Company to make false and misleading statements as outlined above, except with respect to the Section 14(a) and Section 20(a) claims.

109.     The Director Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

110.     The Director Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Director Defendants had actual knowledge of the misrepresentations and

omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

111.    The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

112.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

113.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Hecla has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

114.    Plaintiff on behalf of Hecla has no adequate remedy at law

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Director Defendant as follows:

a.     Declaring that Plaintiff may maintain this action on behalf of Hecla, and that Plaintiff is an adequate representative of the Company;

b.     Declaring that the Director Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Hecla;

c.     Determining and awarding to Hecla the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

d.     Directing Hecla and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Hecla and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Hecla to nominate at least six candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

e.     Awarding Hecla restitution from Director Defendants, and each of them;

f.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

g.    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 2, 2019                     **O'KELLY ERNST & JOYCE, LLC**

                                          */s/ Ryan M. Ernst*
                                          Ryan M. Ernst, Esq. (No. 4788)
                                          901 N. Market Street, Suite 1000
**OF COUNSEL:**                           Wilmington, DE 19801
                                          Phone (302) 778-4000
                                          Email: rernst@oelegal.com
**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
Mark Levine                               *Attorneys for Plaintiff Bruce Fiegel*
55 Broadway, 10th Floor
New York, NY 10006
T. 212.363.7500
F. 212.363.7171